Filed 8/10/16  P. v. Bisel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>GREGORY EUGENE BISEL,<br><br>  Defendant and Appellant. | F069380<br><br>(Fresno Super. Ct. No. F12905849)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. James Petrucelli, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Gregory Eugene Bisel, a registered sex offender with two prior convictions, was charged and convicted of two counts of annoying or molesting two

boys under the age of 18 years, based on two separate incidents:  16-year-old A.G. in July 2012 (count II) and 14-year-old T.H. in August 2012 (count I).  (Pen. Code, § 647.6, subd. (c)(2).)[1]  He was sentenced to the second strike term of 15 years 8 months.

On appeal, defendant argues the court abused its discretion when it denied his motion for a mistrial based on a discovery violation, when the investigating officer revealed at trial that he recorded his interview with A.G., the victim in count II, and he failed to previously disclose its existence or turn it over to either the prosecution or defense.  After the disclosure, the recording was immediately turned over to the defense, but defendant argued the belated disclosure was prejudicial.  Defendant also argues the court abused its discretion when it denied his motion at the sentencing hearing to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  We affirm.

## FACTS

At trial, it was stipulated that on January 23, 1997, defendant was convicted of committing a lewd act on D. a child under the age of 14 years (§ 288, subd. (a)); and annoying or molesting S., a child under the age of 18 years (§ 647.6).  At the time of the offenses in this case, defendant was on parole, he was a registered sex offender, and he knew he was restricted from being with anyone under the age of 18 years.

**Defendant and A.G. at the Apartment Complex (Count II)**

On July 4, 2012, Lidia Dominguez lived in the same apartment complex as defendant.  She knew he was a registered sex offender.  On that day, Dominquez saw defendant take a boy into his apartment.  Dominquez believed the boy was about 12 years old.  The boy was smoking, and defendant was carrying a bag with beverages.  Dominquez reported the observation to the apartment manager.  The apartment manager called the police department.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

On July 5, 2012, Fresno Police Officer Jose Jauregui received an email about defendant being involved in a suspicious incident. Jauregui and Detective Shawn Bishop responded to the apartment complex and contacted the manager. They knocked on defendant's apartment door, but no one answered.

As they waited at the apartment, Detective Bishop saw defendant drive into the complex with a boy in his car. The officers went to the carport and approached defendant's parked car. The officers asked defendant to get out of the car and escorted him away from the boy, later identified as 16-year-old, A.G.

Officer Jauregui asked defendant about the boy. Defendant shouted, "[H]e's my nephew, he's my nephew." Jauregui asked defendant to identify the boy's parents. Defendant did not immediately respond. He then gave a woman's name and said she lived in Mendota. Jauregui asked defendant about his relationship with the boy. Defendant said the boy was only visiting, and he was not staying with him.

Officer Jauregui testified defendant appeared to have been drinking. He had bloodshot, watery eyes, and there was the odor of alcohol on his breath. Jauregui tried to ask more questions, but defendant became uncooperative and would not answer.

Officer Jauregui interviewed A.G. at the scene, and advised him that a concerned citizen had seen them together the previous day. He wanted to make sure A.G. was okay.[2] Jauregui testified A.G. was quiet, upset, embarrassed, and reluctant to answer any questions. A.G. told Jauregui that he met defendant two months earlier while he was

---

[2] As we will discuss in issue I, *post*, Officer Jauregui revealed for the first time during his trial testimony that he tape-recorded his interview with A.G.; neither the prosecutor nor defense counsel knew about or had been given the recording prior to trial. Jauregui provided the recording to both parties that same day. Defense counsel subsequently used the tape to impeach portions of Jauregui's previous testimony about the length and certain portions of the interview. Defense counsel later moved for a mistrial because of the discovery violation. The court denied the mistrial motion but instructed the jury about the discovery violation. On appeal, defendant argues the court abused its discretion when it denied the mistrial motion.

hanging out in front of a drug store. They became friends and were together about 10 times. They went to lunch and drove around on these occasions.

Officer Jauregui testified that A.G. said defendant brought him to his apartment the previous day, July 4, 2012. They had been driving around, and defendant said he needed to do his laundry. A.G. said they were just "kicking back" that day and nothing sexual happened. However, A.G. also said that defendant tried to touch his crotch area. A.G. hit his hand away. A.G. said defendant offered money so he could touch him. A.G. told defendant he would take the money, but defendant could not touch him anywhere because he didn't "roll the dice like that."

Officer Jauregui testified he asked A.G. what they were doing just before the officers contacted them at the apartment's carport. A.G. said he had been trying to get to his mother's house in Mendota. He was hanging out on the street and saw defendant, who offered him a ride. A.G. got into the car, and defendant said he had to stop at his house first to do some chores.

### *A.G.'s Trial Testimony*

At trial, A.G. testified he was living at a group home when he met defendant. He was hanging out with friends at a drug store when defendant drove in the parking lot. Defendant said his name was "Gary." A.G. testified he did not know defendant's real first name was "Gregory." Defendant asked A.G. to get in his car. A.G. testified he could not remember if he got into defendant's car that day. A.G. testified defendant bought him food. A.G. went to defendant's apartment "at the most" twice.

A.G. testified that on July 5, 2012, he was hanging around the same drug store. Defendant drove by and they talked. A.G. said he wanted to get to his mother's house in Mendota and he had missed the bus. Defendant offered to drive him to Mendota and A.G. accepted. Defendant said he had to stop by his apartment first and do the laundry. A.G. got into the car. A.G. testified he saw defendant drinking Bud Light beer in the car. He thought defendant was drunk because he could not handle the steering wheel.

4.

A.G. testified that as defendant pulled into his apartment complex, defendant tried to touch A.G.'s crotch over his clothes. A.G. testified he "whacked his hand away." Defendant offered money to A.G. He believed defendant offered him money for sex: "… I was told by everyone I know that nobody just offers you money just for the heck of it." A.G. refused the money and told defendant, " 'That's not how I roll the dice when I go to the casino.' " A.G. wanted defendant to know that he liked girls.

A.G. testified the police stopped defendant's car shortly after defendant tried to touch him. Defendant told A.G. to say that he was defendant's 18-year-old nephew. When defendant talked to the police, he falsely claimed he was A.G.'s uncle. Defendant called out to A.G., " 'Tell them that you're my 18-year-old nephew.' "

A.G. testified he spoke to the officers at the apartment complex and gave a statement. He told the police that defendant was lying about being his uncle. A.G. learned defendant's true name, and that he was a registered sex offender.

A.G. testified defendant offered money to him on more than one occasion. These offers occurred when A.G. was in defendant's car, but A.G. could not remember when the incidents happened. A.G. testified defendant offered him money to "do some kind of sexual actions and I said, 'No, but I'll take your money, though.' "

**Defendant and T.H. at the Mall (Count I)**

The second incident charged against defendant occurred on August 5, 2012, at Sierra Vista Mall in Clovis. Tanya Romero (Romero) was working at "Hot Dog On A Stick," a fast food restaurant at the mall. She had been in the back of the store and returned to the front counter to take a customer's order.

Defendant was the customer who was waiting at the counter.[3] Romero testified defendant asked her what she had been doing. Romero said she had been working in the

_____

[3] The record reflects that defendant was not taken into custody during the investigation into the incident with A.G. on July 5, 2012.

back.  Defendant asked Romero if she had been smoking crack.  Romero testified defendant was rude and very strange.  He seemed very angry and he made her uncomfortable.  Romero thought defendant could have been drunk or intoxicated based on his movements, because he did not seem completely aware of everything.

Romero did not reply to defendant's question about drugs and took his order.  Defendant bought a hot dog and sat at a table in front of the restaurant.

Around the same time, 14-year-old T.H. arrived at the mall.  T.H. sat at a table in front of "Hot Dot On a Stick" and waited to meet some friends.

T.H. testified defendant moved from his table and sat at T.H.'s table.  Defendant asked T.H. if he wanted to be his friend.  T.H. testified he did not know defendant and thought he might be mentally unstable.  T.H. replied, "[S]ure," because he did not want to be rude.

T.H. testified defendant got up from the table.  Defendant told T.H.:  " 'Come on, let's go.' "  T.H. refused and said he was waiting for his friends.  T.H. testified he was uncomfortable with defendant, and afraid that he wanted to kidnap or sexually assault him.  T.H. testified defendant became flustered and angry when T.H. refused to go with him.  Defendant again sat down at T.H.'s table and asked him, "Well, do you not want to be with me?"  T.H. said, " 'It's not that I don't want to be with you.  It's that I'm waiting for my friends.' "  Defendant replied, "Well, then, what the f[**]k?"

T.H. testified defendant calmed down.  Defendant produced a pen and paper, and asked T.H. for his name and telephone number.  T.H. wrote down a fake name and number, and identified himself as "Lucas."  Defendant took the paper and left.

Romero, the restaurant employee, had watched the encounter between defendant and T.H.  Romero was concerned that defendant was talking to a young boy, and believed T.H. looked very uncomfortable.  Romero testified defendant had been rude to her, but he acted "sort of too nice" to T.H.  Romero called mall security while defendant was still talking to T.H.  After defendant left, Romero told T.H. that she had seen the incident and

6.

called security.  Romero testified the mall's security guards followed defendant as he left the area.

Clovis Police Officer Dave Roseno responded to the call from the mall's security guards about a suspicious older male talking to a young male.  The security guards advised dispatch about defendant's location in the parking lot.  Roseno followed their directions and contacted defendant in the parking lot.

Officer Roseno testified defendant smelled like alcohol and acted incoherent, but he was not under the influence.  Defendant was belligerent and refused to answer Roseno's questions.  Defendant acted like he had a hard time pulling out his identification from his pocket.  Roseno believed defendant "was playing some sort of game with me."  Roseno placed defendant in handcuffs and in his patrol car for safety reasons.

Officer Roseno went into the mall and spoke with T.H.  Roseno then returned to the parking lot and searched defendant's car.  He found one empty 24-ounce can of Bud Light, and two closed Bud Lights, which were cold to the touch.  A roll of industrial-strength packing tape was in the trunk.  Roseno searched defendant and found the paper with the name "Lucas" and a telephone number.

Officer Roseno asked defendant about Lucas and what happened in the mall. Defendant said he did not know what Roseno was talking about.  Defendant denied that anything inappropriate happened inside the mall.

## DEFENDANT'S TRIAL TESTIMONY

### A.G. (Count II)

Defendant testified he did not engage in any inappropriate conduct with T.H. or A.G.  He described A.G. as "a local urchin" who sat at the street corner, wore ragged clothes, asked for change, and said he was hungry.  Defendant gave him a few dollars for food.  Defendant regularly saw A.G. at the same corner.  He seemed like "a pretty nice

kid." Defendant took him to fast food restaurants, and A.G. thought "I was Daddy Warbucks."

Defendant testified he took A.G. with him on errands because A.G. wanted to spend time with him. Defendant took A.G. to his apartment twice when he had to do chores. There was no sexual activity between them. Defendant testified he was not sexually attracted to A.G., and he never tried to grab A.G.'s body in any way. Defendant never offered money for sex and only gave him money for food.

Defendant testified that on July 5, 2012, he was driving by A.G.'s regular corner and A.G. flagged him down. A.G. said he needed a ride to Mendota. Defendant agreed to take him to another bus stop where he could get on the right bus. Defendant first went to his apartment to do the laundry, and the police were there.

Defendant admitted that he falsely told the police that A.G. was his 18-year-old nephew. He made the statement in a loud voice so A.G. would hear him. Defendant knew he was on parole "for a nonsexual crime," and he was restricted from being with anyone under the age of 18 years. A.G. had told defendant that he was 16 years old. Defendant admitted it was not smart for him to hang out with a teenager, and he was worried his parole agent would find out.

### T.H. (Count I)

Defendant also testified about the mall incident with T.H. He went to the mall to see a movie by himself. He had been drinking beer that day. He went to the hot dog stand to get something to eat, but the employee was not there. He was annoyed that he had to wait. When the clerk finally appeared at the counter, defendant asked if she had been smoking pot because he knew of an incident where the staff had done that at another fast food restaurant. Defendant testified he might have acted a little "authoritarian" when he spoke to the clerk, and he wanted to "harass her, as an authoritarian with fast-food experience" because he used to work at fast food restaurants.

Defendant testified he noticed a teenage boy, later identified as T.H., who was sitting at a nearby table. He did not know T.H. but described him as "probably a local mall rat." T.H. was looking at the female restaurant clerk. Defendant thought T.H. might have a crush on her. Defendant testified he decided to talk to T.H. because defendant was "gregarious" and "a busybody sometimes." Defendant intended to "find out about what's the deal with this girl … who won't wait on her customers, what's her attitude all about and all that."

Defendant testified he sat down with T.H. and was surprised that the boy looked sad. Defendant asked him about the restaurant clerk. Defendant admitted he was intoxicated at the time. Defendant denied having any sexual interest in T.H. He might have asked T.H. if he wanted to be his friend. He did not ask T.H. to leave with him. Defendant asked for the boy's telephone number because he thought T.H. wanted to talk to someone. Defendant wanted to help him because "I'm a big helper." Defendant gave him a card and a pen. T.H. wrote something and gave the card back to him. Defendant told T.H. that he might call him sometime.

Defendant testified he walked away and did not know that he was being followed by mall security. He felt intoxicated. He went into the parking lot and walked around, and the police stopped him.

Defendant testified he did not exercise very good judgment on both occasions with T.H. and A.G. because he had consumed alcohol, which resulted in poor decision making. Defendant admitted he did not learn his lesson between the two incidents on July 5, and August 5, 2012.

**Defendant's Prior Convictions**

Defendant testified he had prior convictions in 1997 that were the result of plea bargains and not a jury trial. Defendant admitted both victims in the prior convictions were teenage boys, but he denied having any sexual interest in teenage boys. Defendant

9.

also admitted that he intended to "help" one of the teenage victims in the prior case, and he was convicted of committing a sexual act against him.

Defendant admitted that as part of one prior conviction, he was accused of lying in bed, under the covers with a young boy, while rubbing his back with his pants down.  He was also accused of touching a young boy's penis and rubbing his buttocks.  Defendant denied committing such acts but admitted he entered into a plea bargain for the charges.

Defendant admitted he wrote a "love" letter to a 16-year-old boy in 1994, and said that he loved the boy more than he loved himself.  Defendant denied having a romantic relationship with the boy, and claimed he "loved" him as part of loving the boy's entire family.

**Charges, Verdict, and Sentence**

On August 5, 2012, defendant was arrested after the incident at the mall. Defendant remained in custody for the entirety of the proceedings.  Deputy Public Defender Scott Baly was appointed to represent defendant.

On May 23, 2013, defendant made a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to discharge Mr. Baly, but subsequently withdrew the motion.[4] On July 9, 2013, the court granted defendant's motion to represent himself pursuant to *Faretta*, immediately prior to the preliminary hearing.  On February 18, 2014, defendant requested reappointment of counsel.  The court granted the motion and Mr. Baly resumed representation of defendant throughout the remainder of the criminal proceedings.

On April 1, 2014, defendant's jury trial began.  On April 10, 2014, defendant was convicted as charged of counts I and II, annoying or molesting a child under the age of 18 with two prior felony convictions based on, respectively, the encounters with T.H. and

---

[4] We will extensively discuss the procedural history of defendant's *Marsden* and *Faretta* motions in issue II, *post*.

A.G. The court found the prior conviction allegations true, that he had one prior strike conviction and served two prior prison terms.

On May 9, 2014, defendant was sentenced to an aggregate term of 15 years 8 months: for count I, the second strike upper term of 12 years; for count II, a consecutive term of two years eight months (double one-third the midterm), plus one year for a prior prison term enhancement.

## DISCUSSION

### I. Denial of Defendant's Motion for Mistrial

As set forth above, Officer Jauregui testified on direct examination about his interview with A.G. at defendant's apartment complex. On cross-examination, Jauregui revealed for the first time that he had recorded his interview with A.G.; he failed to mention the recording in his report; he failed to turn it over to the prosecutor; and he still had the recording in his possession. Neither the prosecutor nor defense counsel knew about the recording. Jauregui provided the recording to the parties later that day. Defense counsel later used the recording to impeach portions of Jauregui's previous testimony about A.G.'s statements. Defendant subsequently moved for a mistrial and argued he did not have sufficient time to prepare a transcript that he could have used for impeachment. The court denied the motion but instructed the jury about the belated discovery.

On appeal, defendant contends the court abused its discretion when it denied his motion for mistrial because of the discovery violation. Defendant argues the belated disclosure of the recording violated his federal due process rights to a fair trial, present a defense, and confront and cross-examine both Officer Jauregui and A.G. about the charges against him. Defendant acknowledges that the recording was provided to his attorney in the midst of trial, but asserts the discovery violation was prejudicial because counsel did not have sufficient time to have the interview transcribed and play the recording to the jury.

11.

As we will explain, the court did not abuse its discretion when it denied defendant's motion for mistrial because the belated disclosure did not result in prejudice.

**A. Discovery**

We begin with the People's "constitutional and [] statutory duty to disclose information to the defense. [Citations.] The constitutional duty arises under the due process clause of the United States Constitution and requires the prosecution to disclose any material evidence exculpatory of the defendant irrespective of the good faith or bad faith of the prosecutor. [Citations.]" (*People v. Bowles* (2011) 198 Cal.App.4th 318, 325 (*Bowles*), citing *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*).)[5]

"There are three components of a *Brady* violation: (1) the evidence must be favorable to the accused, meaning it is exculpatory, or impeaching; (2) the evidence must have been willfully or inadvertently suppressed by the State; and (3) prejudice must have ensued because the evidence was material to the issue of guilt and innocence of the accused by establishing a reasonable probability of a different result. [Citation.]" (*Bowles*, *supra*, 198 Cal.App.4th at p. 325.)

"The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)

"The California statutory discovery scheme (§ 1054 et seq.) requires that the prosecution disclose specified information to the defense, including any 'exculpatory

---

[5] The People contend that defendant has not argued that the belated disclosure of the tape violated *Brady*. On appeal, however, defendant has renewed the argument he made at trial, that the belated disclosure violated both his federal due process rights to a fair trial and to present a defense, and the statutory reciprocal discovery provisions.

evidence,' …. [Citations.] Absent good cause, such evidence must be disclosed at least 30 days prior to trial, or immediately if discovered or obtained within 30 days of trial. [Citation.]" (*Bowles*, *supra*, 198 Cal.App.4th at p. 325.) Exculpatory evidence for purposes of the statute includes significant impeachment evidence. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1164.)

The statutory duty to disclose extends to information "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (§ 1054.1.) This has been interpreted to mean that materials not literally in the prosecution's hands but " 'reasonably accessible' " through investigating agencies must be produced. (*In re Littlefield* (1993) 5 Cal.4th 122, 135.) "Section 1054.1 concisely lists six specific items that the prosecution must disclose to the defendant or his or her attorney, and, consistent with the stated purposes of discovery provisions of [section 1054 et seq.], the prosecution has a duty to inquire in order to satisfy these requirements." (*People v. Little* (1997) 59 Cal.App.4th 426, 432–433.) One of these statutorily-defined items includes "[r]elevant written or *recorded statements* of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial …." (§ 1054.1, subd. (f), italics added.)

"The trial court has broad discretion to fashion a remedy in the event of a discovery abuse to ensure that the defendant receives a fair trial. [Citation.] The trial court may enforce the discovery statutes by ordering 'immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.' [Citation.] If these sanctions have been exhausted, the trial court may also prohibit the testimony of a witness. [Citation.] Finally, if required to do so by the Constitution of the United States, the trial court can dismiss a charge. [Citation.]" (*Bowles*, *supra*, 198 Cal.App.4th at pp. 325–326.)

A ruling on a motion for mistrial is reviewed for an abuse of discretion, as is the determination of what, if any, remedy is required for a discovery violation. (*People v. Ayala* (2000) 23 Cal.4th 225, 282; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 792.)

With these standards in mind, we turn to the procedural background of the belated disclosure of Officer Jauregui's tape-recorded interview with A.G., defense counsel's use of that recording during trial, and defendant's motion for mistrial.

### B. A.G.'s Trial Testimony

On April 1, 2014, defendant's jury trial began. He was represented by Mr. Baly, a deputy public defender.

On April 3, 2014, A.G. testified as a prosecution witness, as set forth above. The prosecutor asked A.G. on direct examination if he made certain statements to the police about the details of his visits to defendant's apartment. A.G. said he did not recall what he told the police about his prior visits to the apartment.

On cross-examination, defense counsel asked A.G. if he read over police reports before he testified to refresh his recollection. A.G. said no. Defense counsel asked A.G. if he "read anything out in the hall." A.G. said: "A little bit, but I don't remember it. It's just mainly what was in my head that I had told you – told him actually [referring to the prosecutor]." On further cross-examination, A.G. testified the district attorney's investigator had shown him a piece of paper before he testified "about the police report and about all the details and stuff like that."

Defense counsel asked A.G. for details about when defendant offered him money for sex. A.G. said he could barely remember what happened because "my brain is like cloudy sometimes. I can't remember all the things at once. I try to, but I can't." Defense counsel asked A.G. if he had a problem with his memory. A.G. said he sometimes thought so, and "[t]hat's why I had to look over that paper real quick, but it helped a little bit, but like it just comes in pieces, though, because the way I was looking at it it just came late some of it and some of it came early to my head."

14.

Defense counsel asked A.G. how much of his testimony was based on his memory as opposed to what he read "on paper" in the hallway that morning. A.G. said "[p]robably like half of it. But just because … that I don't remember it, though, doesn't mean it didn't happen."

A.G. was excused subject to recall.

## C. Officer Jauregui Testifies About the Recording

On Friday, April 4, 2014, Officer Jauregui testified as a prosecution witness about his investigation into defendant's contact with A.G. Jauregui testified he interviewed A.G. at defendant's apartment complex, and the interview lasted 40 to 45 minutes.

During cross-examination, Officer Jauregui again testified he spoke to A.G. for about 45 minutes. Jauregui also revealed for the first time that he tape-recorded his interview with A.G.

"[DEFENSE COUNSEL]:     Where in your report did you document that you tape-recorded the interview with [A.G.]?

"A.     I did not, sir.

"Q.     Do you have that tape-recording?

"A.     I believe I still do. [¶] … [¶]

"Q.     When you take a recorded statement from a minor in a sexual assault case, do you typically book the interview recorded into evidence.

"A.     I believe so, yes.

"Q.     In your interview in this case, did you book it into evidence?

"A.     I don't recall, sir.

"Q.     Do you know where it is?

"A.     What, the recording?

"Q.     Yes.

"A.     I believe I still have it, yes."

15.

Officer Jauregui testified the tape recording was in his office.

The court had a side-bar conference with the parties, and then continued with another witness. After that, the court released the jury for the weekend.

### D. Discussions About the Recording

After the jury was excused, the court asked the parties to address Officer Jauregui's revelation about the recording of his interview with A.G. Mr. Baly, defense counsel, said the tape recording was newly discovered evidence. He wanted to listen to the tape recording and then he would make certain motions. The court agreed and called a recess until Monday morning.

It is undisputed by the parties that Officer Jauregui retrieved the tape recording of A.G.'s interview that Friday afternoon, and it was provided to both the prosecution and defense.

### E. Cross-Examination of Officer Jauregui About the Recording

On Monday morning, April 7, 2014, the court reconvened and defense counsel recalled Officer Jauregui to the stand.

Defense counsel asked Officer Jauregui about what happened on Friday afternoon after he disclosed the existence of the tape recording of A.G.'s interview. Jauregui testified the prosecutor and defense counsel asked him to go to his office and get it. Jauregui drove to his office and determined the recording was "on an audio recorder," a small portable device that was in his desk drawer. The interview was saved as a file. He plugged the recorder into the computer and retrieved the recording of the interview. He provided the audio recorder to the prosecutor's investigator, who produced CDs of the recorded interview for both parties.

Defense counsel did not play the recorded interview in the jury's presence. Instead, he asked Officer Jauregui to listen to certain portions of the interview with headphones, and then questioned Jauregui about conflicts between his previous trial testimony and A.G.'s recorded statements.

16.

Officer Jauregui testified he did not tell A.G. that he was recording the interview. Defense counsel reminded Jauregui that he previously testified that his interview with A.G. lasted 45 minutes. Jauregui conceded the tape recording of the interview was only 15 minutes, and he had mistakenly given a round approximation. Jauregui agreed that he previously testified that A.G. said he only knew defendant as "Gary." The recorded interview revealed that A.G. said "he knew [defendant] as Gary but his name was Gregory but he should be called Gary," and this statement was not in his report.

Defense counsel asked Officer Jauregui if he repeatedly asked A.G. whether he was a runaway from a group home. Jauregui testified A.G. said he was on a permitted leave, and Jauregui told A.G. that he would find out the truth if he was a runaway. Jauregui could not recall if A.G. was frightened, or if Jauregui told A.G. that he was "no rookie cop," and he was going to call his mother. Defense counsel asked Jauregui to listen to another portion of the taped interview through his headphones. After listening, Jauregui agreed that he told A.G. that he was not a rookie cop, and that he had been around for a while.

Officer Jauregui testified he asked A.G. if defendant asked him to do anything, and if he touched A.G. A.G. initially said no. Defense counsel asked Jauregui if A.G. became emotional, and if he asked to search A.G.'s backpack. Jauregui said he could not remember. Defense counsel asked Jauregui to listen to another portion of the recording on his headphones. After doing so, Jauregui testified he asked A.G. to show him what was in his backpack, and A.G. opened it for him. Jauregui also testified A.G. was tearing up and emotional while he looked through the backpack.

Defense counsel asked Officer Jauregui if A.G. wanted to know whether "he" was going to jail. Jauregui testified his interpretation of A.G.'s question was that A.G. asked if defendant was going to jail, and Jauregui told him not to worry about that.

In response to further cross-examination about the recording, Officer Jauregui testified that at the end of the recorded interview, A.G. said defendant tried to touch his

17.

private area, and he slapped his hand away. Jauregui asked A.G. how it happened. A.G. said he could not remember, but he slapped defendant's hand away. A.G. said defendant bought him food, but did not give him alcohol or drugs.

Officer Jauregui was excused subject to recall. The prosecution continued with its witnesses about the mall incident with T.H.

Officer Jauregui's tape-recorded interview with A.G. was not played for the jury or marked for evidence.

### F.  Motion for Mistrial

After the prosecution rested, defense counsel moved for a mistrial based on the late discovery and disclosure of Officer Jauregui's recorded interview with A.G. Defense counsel complained the recording should have been booked into evidence and provided to the defense during the initial discovery period. Defense counsel reminded the court that he initially represented defendant until the court granted defendant's *Faretta* motion. Defense counsel further stated that defendant made an informal motion for discovery when he represented himself. When Mr. Baly was reappointed to represent defendant, he sent an e-mail to the prosecution to ensure he had received all discovery. He did not receive the tape recording. Instead, the recording was "secreted and hidden from counsel" where it could not be found, and it was not mentioned in Jauregui's report.

Defense counsel argued the prosecution's failure to turn over the recording violated defendant's rights to due process, equal protection and a fair trial. The delayed discovery lasted for over one year, and included the period where defendant represented himself while in custody. The belated disclosure of the recording was prejudicial and a mistrial should be granted.

The prosecutor conceded there was an obligation to turn over the recording, but stated that he did not learn about the existence of the recording until Officer Jauregui testified, which was the same time that defense counsel heard about it. The prosecutor confirmed that defense counsel sent an e-mail for informal discovery on March 26, 2014,

18.

just before trial started, and the tape recording was turned over on April 4, 2014. The prosecutor argued sanctions could not be imposed unless a 15-day period had been violated after a formal discovery motion. The prosecutor also argued the defense had the weekend to review the tape recording, and the interview was incriminating against defendant.

Defense counsel replied the delayed discovery was prejudicial because there were inconsistencies between Officer Jauregui's report and the recording, and there was no time to prepare a transcript. Defense counsel argued:

> "Without the benefit of a specific transcript, we've tried to accommodate refreshing [Officer Jauregui's] memory by the use of headphones in the courtroom during cross-examination.
>
> "Also, taking a substantial break where the officer listened to the entire interview again to refresh his memory is not as good as having a transcript. A transcript for a 15-minute interview is not easy to produce. Normally the Rules of Court would require that the transcript be provided weeks before trial to be shared and agreed upon between parties before the trial.
>
> "There are disagreements of the statements made in this recording that are left only to be the disagreement of opinion as to whether or not [A.G.] made certain statements. And under the circumstances, that's the best I can do.
>
> "This statement should have been provided early on. It should have been identified in the police report. It should have been booked into evidence, which would have been the appropriate departmental procedure to follow. I don't think there's any denial of that. I don't think there's any question that it's inappropriate for an officer to record a statement of a witness and then not to book it, instead to keep it in his desk drawer where, at the last minute in trial, he comes up with it at the last minute.
>
> "This has made defending [defendant], as it relates to the statement, more difficult. And that's the prejudice that I think exists in this case."

19.

## G. **The Court's Denial of the Motion for Mistrial**

The court accepted defendant's representation that he made an informal discovery request when he represented himself. The court rejected the prosecutor's statement that sanctions could not be imposed without a formal discovery motion.

The court found there was no prosecutorial misconduct and agreed that the prosecutor and defense counsel learned about the tape recording for the first time when Officer Jauregui testified the previous Friday: "I think the look on [the prosecutor's] face was probably as shocking as the look on [defense counsel's] face," when Jauregui testified about the recording.[6]

The court denied defendant's motion for mistrial:

"This was a police officer error, an oversight. No different than officers that generally will destroy their notes after they've made their report, this officer probably forgot to destroy the tape. I don't know that anybody asked him specifically previously; he certainly didn't volunteer it or check it into evidence. And everything [defense counsel] said is correct. Absolutely everything was correct. It should have been booked into evidence. I think because it was an oversight, and not only wasn't booked into evidence but probably forgotten about on the recorder because there was some problems recovering it, I think that that's why it was never told to the People. And clearly from the testimony that I received, I wasn't even sure that this officer knew if he still had it or not, and as it turned out, apparently with some effort, it could be recovered somewhat.

"With regard to the evidence, clearly the law states that the motion should be granted only if there is prejudice, first of all, and that that prejudice cannot be cured by instruction or by jury admonition. [*People v. Jenkins* (2000) 22 Cal.4th 900, 985.]

"I don't see the prejudice. While there is [*sic*] some inconsistencies – and certainly as pointed out by the People, I gave [defense counsel] about as much time as the Court could or felt necessary. It was a short interview.

---

[6] On appeal, defendant has not raised any claims of prosecutorial misconduct or challenged the trial court's finding that the prosecutor did not know about the recording's existence until Officer Jauregui revealed the information during his testimony. (See, e.g., *People v. Gatlin* (1989) 209 Cal.App.3d 31, 38.)

And while I certainly recognize that everybody is understaffed, there certainly was time, if the decision was to be made, to have it transcribed over the weekend.

"But more importantly, I think that there's very little prejudice which attaches to that late discovery evidence. But in an abundance of caution, the only sanction that I will impose is that the Court will, in its own discretion, give [CALCRIM No.] 306, untimely disclosure of evidence. I think that that's appropriate. And the Court will include that in the jury instructions, but that will be the only sanction."

The court found the instruction was "more than sufficient to cure any perceived prejudice, because I don't see the prejudice involved, but any perceived prejudice that the jury may determine. [T]he instruction is to evaluate the weight and significance of any evidence and consider the effect, if any, on the late disclosure. So I think that would be appropriate pursuant to the case law."

## H. The Cautionary Instruction

During the instructional phase, the court gave CALCRIM No. 306 regarding the discovery violation:

"Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence to counter opposing evidence or to receive a fair trial. The attorney for the People failed to disclose the audio recording of [A.G.'s] statement within the legal time period. In evaluating the weight and significance of that evidence, you may consider the effect, if any, on the late disclosure."

## I. Analysis

Defendant contends the court abused its discretion when it denied his motion for mistrial because the belated disclosure of the recording violated *Brady* and section 1054.1, et seq. Defendant acknowledges that the recording was provided to his attorney in the midst of trial, but asserts the discovery violation was prejudicial because the recording would have impeached the trial testimony of Officer Jauregui and A.G. Defendant argues he did not have sufficient time to have the interview transcribed, reach

21.

an agreement with the prosecutor on a corrected transcript, and play all or portion of the recording to the jury.

Evidence tending to impeach the credibility of a prosecution witness may be deemed favorable to the defense under *Brady*, but defendant has the burden to show prejudice from late discovery. (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1214; *People v. Gatlin*, *supra*, 209 Cal.App.3d at p. 38.) The late disclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

Defendant has failed to show prejudice. First, it is undisputed that defendant received a copy of the recording on Friday, April 4, 2014, just hours after Officer Jauregui revealed its existence during his trial testimony. This satisfied the statutory requirement of "immediate disclosure of materials that become known during trial. [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 287.) In addition, under *Brady* "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) Defense counsel used the recording when the court reconvened on Monday, April 7, 2014, to extensively impeach Jauregui's prior testimony by having him listen to the recording through headphones, and eliciting his admissions that he had misstated certain aspects of A.G.'s statement.

Despite conducting a lengthy cross-examination of Officer Jauregui, defense counsel moved for a mistrial that day. He complained that he did not have sufficient time over the weekend to obtain a transcript, as a prerequisite for playing the entire recording to the jury. Defendant repeats this argument on appeal. However, there is no evidence defendant tried to have the 15-minute recording transcribed over the weekend. While counsel said it was difficult to have a transcription prepared in a short period of time, there is no evidence that he attempted to start the process on Friday afternoon or Monday

22.

morning.  Defense counsel made the motion for mistrial on Monday, but he never asked for a continuance to obtain a transcription.

Defendant also complains that the belated disclosure of the recording occurred after A.G. testified and thus prevented him from impeaching A.G. with prior inconsistent statements.  He fails to note that A.G. was excused subject to recall.  There is no evidence defendant attempted to recall A.G., that he asked for continuance to locate A.G., or that he was unable to do so.

As for the recording itself, defendant never made an offer of proof to the court that the recording contained any exculpatory evidence, or additional impeachment evidence aside from the portions used to cross-examine Officer Jauregui.  While defendant complained he lacked sufficient time to obtain a transcript over the weekend, he could have used the nearly 30-day period between the verdict and the sentencing hearing to obtain a transcript as the basis for a new trial motion, which might have demonstrated whether the entirety of the recording aided the defense case.

In the absence of such a transcript or offer of proof, we are left to speculate as to the contents of the recording, and whether it contained any additional material that would have further assisted in the cross-examination of Officer Jauregui or undermined A.G.'s accusations against defendant.  "[M]ere speculation that there *might have been* something useful for impeachment purposes … is not sufficient to demonstrate a *Brady* violation. [Citation.]"  (*People v. Ashraf*, *supra*, 151 Cal.App.4th at p. 1214, italics in original.)

A motion for mistrial "supposes error plus incurable prejudice."  (*People v. Gatlin*, *supra*, 209 Cal.App.3d at p. 38.)  A motion based on a discovery violation should be granted only when a party's chances of receiving a fair trial have been irreparably damaged.  (*People v. Ayala*, *supra*, 23 Cal.4th at p. 283.)  "It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.  [Citation.]"  (*People v. Pinholster* (1992) 1 Cal.4th 865, 941.)

While the officer's late disclosure was unfortunate and inexcusable, we conclude that defendant has failed to meet this burden, and the belated disclosure of the recording was not prejudicial under the circumstances and did not undermine the reliability of the proceedings. Defense counsel ably used the recording to cross-examine Officer Jauregui, who admitted there were inconsistencies between his prior testimony and the recorded interview. The jury was well aware of inconsistencies in A.G.'s statements based on his own trial testimony. However, there is no evidence that the recording contained any exculpatory evidence, or evidence that would have further impeached the testimony of Jauregui and A.G. about the charged offense in count II. Defendant did not request a continuance to recall A.G. as a witness, make an offer of proof as to the contents of the recording, or obtain a transcript of the 15-minute interview to preserve appellate review.

## II.    Denial of *Faretta* Motion at Sentencing Hearing

Just before the preliminary hearing, the superior court granted defendant's motion to represent himself pursuant to *Faretta*. Defendant later requested reappointment of counsel prior to trial. At the beginning of the sentencing hearing, defendant again requested to represent himself. The court denied the motion and found his request was made to delay and/or disrupt the proceedings.

Defendant contends the court committed reversible error when it denied his postverdict *Faretta* motion to represent himself at the sentencing hearing. Defendant claims he was ready to represent himself at the hearing, and there is no evidence that he made the motion to delay or disrupt the proceedings.

We review the lengthy procedural history of this case, which refutes defendant's contentions. The record shows that defendant's previous *Marsden* and *Faretta* motions, and his disruptive conduct, support the trial court's denial of his postverdict *Faretta* motion.

24.

**A.** *Faretta* **Motions**

We begin with the applicable legal principles. "A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers. [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 97–98.) A motion for self-representation at sentencing must be made within a reasonable time prior to the commencement of the sentencing hearing. (*People v. Mayfield* (1997) 14 Cal.4th 668, 810, reversed on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.) The erroneous denial of a timely and unequivocal *Faretta* request is reversible error per se. (*People v. Valdez, supra,* 32 Cal.4th at p. 98.)

However, *Faretta* and later cases "have made clear that the right of self-representation is not absolute. [Citations.]" (*Indiana v. Edwards* (2008) 554 U.S. 164, 171.) A *Faretta* motion may be denied "if the defendant is not competent to represent himself [citation], is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations], or the motion is made for purpose of delay [citation]." (*People v. Lynch* (2010) 50 Cal.4th 693, 722, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.)

A *Faretta* motion "made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice" is not unequivocal and may be denied. (*People v. Marshall* (1997) 15 Cal.4th 1, 23.) The "court possesses much discretion" to decide "whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*People v. Welch* (1999) 20 Cal.4th 701, 735.) The court's exercise of discretion will not be disturbed in the absence of a clear abuse. (*Ibid.*)

25.

## B. Appointment of the Public Defender

On August 5, 2012, defendant was arrested and booked into jail after the incident at the mall.  His bail was set at $145,000.  On August 7, 2012, the felony complaint was filed.  On August 8, 2012, defendant appeared with the public defender and pleaded not guilty.  Deputy Public Defender Scott Baly represented defendant.

On May 9, 2013, Mr. Baly filed a motion to reduce defendant's bail.

## C. First *Marsden* Motion

On May 23, 2013, Judge Sarkisian convened the scheduled preliminary hearing. Defendant appeared with Mr. Baly, who said defendant wanted to make a Marsden motion.

### 1. *Marsden Hearing*

At the *Marsden* hearing, defendant extensively complained that Mr. Baly refused to subpoena witnesses and conduct a full evidentiary hearing at the preliminary hearing. Defendant also complained that his previous public defender tried to force him to accept a plea bargain of eight years for "talking to a Corn Dog On A Stick girl."  Defendant also said that he heard Mr. Baly "is the best that is available frankly."  Defendant demanded that the court conduct the bail reduction hearing immediately.

The court explained to defendant that it was hearing his *Marsden* motion and not the bail reduction motion.  The court also explained that if it granted his *Marsden* motion, it would relieve Mr. Baly and appoint another public defender.  Defendant said he would withdraw his *Marsden* motion if that was the case.

### 2. *Continuance of Preliminary Hearing*

After the *Marsden* hearing, the court advised the prosecutor that defendant withdrew his *Marsden* motion.  The court asked the prosecutor to call his first witness for the preliminary hearing.  Defendant interrupted and said he was not feeling well because he suffered a fall at the jail the previous day.  Mr. Baly confirmed that defendant had suffered an injury.  Defendant wanted the court to conduct the bail reduction hearing first,

and he was willing to waive time to continue the preliminary hearing. The prosecutor objected because the witnesses had been subpoenaed.

The court asked the parties to confer, and they agreed to continue both the bail reduction and preliminary hearings. Defendant again interrupted and asked the court to conduct the bail reduction hearing immediately.

The court decided to transfer the bail reduction hearing to another department and continued both hearings.

### D. First *Faretta* Motion

On July 9, 2013, Judge Ellison convened the preliminary hearing. At the beginning of the hearing, defendant requested to discharge Mr. Baly and represent himself pursuant to *Faretta*. Defendant filled out the *Faretta* questionnaire. The court conducted a hearing, granted the *Faretta* motion, and relieved Mr. Baly.

### E. The Preliminary Hearing

Also on July 9, 2013, immediately after it granted defendant's *Faretta* motion, the court turned to the matter of the preliminary hearing. Defendant said he was prepared to represent himself at the preliminary hearing that day. As the court addressed evidentiary matters, defendant repeatedly interrupted and demanded to subpoena witnesses. The court denied the request.

Thereafter, the court conducted the preliminary hearing. As Officer Rosano testified about the mall incident with T.H., defendant interrupted and said he was being "[s]teamrolled" and forced to proceed without any rights. The court reminded defendant that he said he was ready to proceed. Defendant said he assumed his attorney had made certain preparations based on his earlier requests to subpoena witnesses for a full evidentiary preliminary hearing. The court directed defendant to stop interrupting and continued with the hearing.

As the witness testified, defendant again interrupted and complained "this is not Joseph Stalin's Russia. This is over." The court replied: "[U]nder the circumstances

27.

here, I think I have no choice really but to revoke [defendant's] right to represent himself. I know that's somewhat problematic since we've begun this preliminary hearing, and they have the witnesses here. [¶] Do you want to attempt to see if we can get Mr. Baly over here to complete the preliminary examination?" The prosecutor said he could try, but also requested to continue the preliminary hearing.

The court decided to continue the hearing and allow defendant to represent himself, despite his behavior.

> "You can just stay there and be quiet. I'll let you ask questions once counsel is finished if you want to. If you don't, you don't have to. But we're going ahead since the witness is on the stand, and we are in the midst of this preliminary hearing. And I have no reason to believe that Mr. Baly is available right now to conduct the preliminary hearing, which he was prepared to do … as you well know."

Defendant said Mr. Baly was not prepared. The court advised defendant that it would conduct the hearing in defendant's absence if he continued to disrupt the proceedings. The court stated:

> "I would prefer not to because I prefer you to have an opportunity to ask this officer questions. The Court is acceding to that understanding that you have chosen to be your own lawyer here, and you're entitled to ask him questions. If you want to forego that and continue to behave in this fashion, we'll do the preliminary hearing without you, sir. That's your choice. You'll be making it, not me. [¶] So if you'd like to ask questions of this officer when [Mr. Lacy] is done, I'll let [you do] that and stay and behave appropriately. If not, I'll have you removed."

After hearing the witnesses, the court held defendant to answer.

### F. **Pretrial Motions**

On July 12, 2013, the information was filed. On July 24, 2013, defendant pleaded not guilty; he continued to represent himself.

On September 19, 2013, defendant filed a motion to reduce bail, and for production of transcripts and discovery.[7]  Defendant asserted he had not received any discovery from Mr. Baly.  Defendant complained the public defender's office "love[d] the thrill of trial" and failed to perform the hard work required to represent clients. Defendant also complained that the public defender's office failed to defend his interests when he was charged and convicted of the previous offenses.

On October 3, 2013, Judge Fain granted defendant's motion for transcripts of previous hearings, and denied his motion to reduce bail; defendant remained in custody for the entirety of the proceedings.  The court granted defendant's motion to continue the trial date.  The trial date was subsequently continued again at defendant's request.

On January 23, 2014, Judge Gaab convened a settlement conference and trial confirmation hearing.  The court asked defendant if he was prepared to start trial on February 3, 2014.  Defendant said the state had raised "roadblocks" which made it impossible for him to go to trial.  Defendant moved to dismiss his case because the "state" had denied his due process rights and interfered with his ability to hire an outside investigator.  The court denied his motion to dismiss.

The court advised defendant that he had two choices:  to declare he was prepared for trial or ask for a continuance, and the court would grant one more continuance. Defendant replied that the court was going to "muzzle" him and he was not "a complete idiot."  Defendant said he was not going to "sit there in jail" where "people are dying of H1N1 flu virus."

The court confirmed the trial date since defendant did not ask for a continuance. Defendant said his due process rights were being violated, revoked his general time waiver, and asked for a new investigator and a new paralegal.

---

[7] As noted in issue I, *post*, defendant's discovery request did not result in disclosure of the recording of A.G.'s interview.

At this point, the reporter's transcript states that "defendant was removed from the courtroom." Defendant said: "Stop it. Let me have my stuff." The hearing ended.

### G. <u>Reappointment of Counsel</u>

On February 18, 2014, defendant's trial was scheduled to begin before Judge Petrucelli. Defendant still represented himself. The court and the prosecutor discussed whether an amended information was going to be filed to correct certain dates. Defendant objected to the use of "inflammatory capitalization and repetition of these charges" in the information.

The court explained the jury would not see the charging document. Defendant interrupted the court and complained the prosecutor had called him a liar at a previous hearing. The court told defendant to stop and advised him of "the ground rules" of representing himself. The court would ensure his constitutional rights were observed, but it would not tolerate any disruptions in front of the jury.

Defendant complained that his court-appointed investigator and paralegal had not done anything to prepare his case, the prosecutor was going to unfairly introduce evidence about his prior convictions, he did not timely receive discovery from Mr. Baly, and his previous motions for discovery and other matters had been ignored by other judges. Defendant also asked for the media to investigate alleged corruption by the sheriff's department in controlling which investigators would help defendants who represented themselves.

The prosecutor believed defendant was trying to delay the trial. The prosecutor explained that defendant had been fully advised of the perils of representing himself; he had received timely and complete discovery; refuted defendant's due process assertions; and explained defendant made the same claims in the midst of the preliminary hearing in an attempt to disrupt the proceeding.

The court noted defendant had previously said he would be ready for trial on that date and found no grounds to grant another continuance. The court said it would begin jury selection.

Defendant interrupted and said he was making a motion for reappointment of counsel. The court took the motion under advisement and called for a recess. After the recess, the court asked defendant to clarify whether he wanted counsel to represent him, or advisory standby counsel to assist him. The court said it would try to determine if Mr. Baly was still available to represent him, if that was agreeable to defendant, because he was familiar with the case and a very competent attorney.

Defendant agreed Mr. Baly was a very capable attorney, and said he would be "very much in better hands, certainly, with Mr. Baly as my attorney in trial." Defendant said he wanted to have Mr. Baly represent him again. The prosecutor objected and said defendant was just trying to "work the system" and delay the trial.

The court acknowledged that another continuance would be prejudicial to the witnesses, but it recognized defendant's constitutional right to counsel. The court intended to contact the public defender's office to determine if Mr. Baly was available. The court reminded defendant that his case was going to time out, and asked whether he would waive time. Defendant said yes.

After another brief recess, the court advised the parties that Mr. Baly was present and agreed to resume representation of defendant. The court and the parties agreed on a continued trial date, and defendant entered a general time waiver.

## H. First Day of Trial; Second *Marsden* Motion

On April 1, 2014, defendant's jury trial was set to begin before Judge Petrucelli. Defendant appeared with Mr. Baly, who advised the court that defendant wanted to make another *Marsden* motion.

At this *Marsden* hearing, defendant gave a lengthy narrative about the history of his case, the failure of his investigator to help when he represented himself, complained

31.

about the public defender's office in general, and claimed Mr. Baly failed to conduct any trial preparation or contact witnesses. He added that Mr. Baly was a "defeatist" and a "saboteur" for the state. Defendant also said Mr. Baly was "very good at what he does." Defendant said he was having a hard time getting his thoughts together and asked for a recess.

The court reminded defendant that he asked for Mr. Baly's reappointment after he withdrew his pro. per. status, and the court "bent over backwards" to grant defendant's request. Defendant again launched into a lengthy history of his case, and complained Mr. Baly investigated the wrong witnesses and failed to contact his suggested witness list.

Mr. Baly said he had met with defendant and went over the discovery materials before defendant was granted pro. per. status. He provided the discovery documents to defendant. After he was reappointed, he made another discovery request to the district attorney's office to make sure he had everything.[8] He reviewed the materials and told defendant that he was ready for trial. Defendant gave him a list of family members for character witnesses. Mr. Baly sent his investigator to contact these people, but he was concerned these witnesses were going to "open the door to his character." Defendant replied they were not ready for trial and the proceedings were a "travesty."

The court denied defendant's *Marsden* motion and found Mr. Baly's account of his trial preparation more credible than defendant's statements. The court also found defendant was responsible for "any deterioration" in their relationship "by your willfully recalcitrant and defiant attitude," and the *Marsden* motion was "another delay tactic … and it's not going to work in this court."

---

[8] As we discussed in issue I, *ante*, defense counsel's request for discovery did not result in disclosure of Officer Jauregui's recording of A.G.'s interview.

## I. Defendant's Motion to Recuse

After the *Marsden* hearing, the court resumed the proceedings and addressed the parties' evidentiary motions.

Mr. Baly said defendant wanted him to make a motion to recuse the court. The court advised defendant that the staff heard him say that he was not going to start the trial that day. The court was suspicious about a recusal motion being made on the first day of trial given the numerous continuances.

Defendant accused the court of misrepresenting whatever efforts it made to have Mr. Baly reappointed to represent him. Defendant said the court exaggerated what it did, and he doubted the court's veracity. The court replied that it did not misrepresent anything, and it was unusual to reappoint the same public defender.

The court advised defendant that it had done everything in its power to make sure he received "supreme representation" and a fair trial. Defendant replied that he was not able to review his notes during the *Marsden* hearing because he was shackled. Defendant also complained that Mr. Baly had "squandered" the last continuance, and he was still not ready for trial.

The court said it was "becoming more and more evident" that defendant was trying to delay the trial. Defendant said the court was cooperating with the "state's program" to "steamroll" him, prevent him from filing various motions, and place him on "a conveyor belt to [the] Wasco [prison]."

The court denied defendant's motion to recuse, explained the motion was not timely, and there was no basis for the motion.

The court and defendant then had an extended discussion about whether defendant would wear the red jail jumpsuit or dress out for the trial. Defendant said he wanted to wear the jumpsuit instead of regular clothes, but he might consider changing if his family brought clothes.

## J. Defendant's Continued Complaints

On April 2, 2014, the second scheduled day of trial, defendant tried to give a letter to the court. The court refused to accept it and conducted jury selection.

On April 3, 2014, the court was about to begin the presentation of evidence. Defendant appeared in civilian clothes and claimed the jail mistreated him when he was "dressing out" that morning. The prosecutor objected. The court said it would allow defendant to make his statement.

Defendant said he was fortunate to have Judge Petrucelli hear the trial and Mr. Baly represent him. However, he felt the jail staff mistreated him after he withdrew his pro. per. status. Defendant said he was making a motion to dismiss his case because of how he was treated that morning. He also moved to reduce his bail and for release on his own recognizance. The court denied the motions and the evidentiary portion of the trial began.

## K. Defendant's Trial Testimony

When defendant was cross-examined by the prosecutor, he repeatedly interrupted the prosecutor's questions, lodged his own "objections" and refused to answer certain questions. The court advised defendant not to make any comments and to allow his attorney to make objections. Defendant ignored the court's admonition and continued to make his own objections as the prosecutor cross-examined him. The court advised defendant that his remarks would not be tolerated "very much longer." Defendant apologized and said he understood.

Despite the admonition, defendant continued to make his own objections and refused to answer questions. The court called a recess and excused the jury. The court then instructed defense counsel to talk to defendant about his conduct. After the recess, defendant returned to the stand. He continued to give narrative answers and make inappropriate comments during cross-examination.

### L.  **Defendant's Statements to the Court**

After both parties rested, and just before the court instructed the jury, defendant asked to address the court.  He said he wanted to preserve his appellate rights and the rights of all "pro. pers. in the future."  Defendant made a lengthy statement, and complained the jail staff was mistreating him and would not let him use the restroom.

### M. **Defendant's Postverdict Statements**

Defendant waived his right to a jury trial on the prior conviction allegations prior to the verdicts.

On April 10, 2014, the jury found defendant guilty of both counts.  The court dismissed the jury, and then asked defendant if he wanted to admit the prior conviction allegations or have a bench trial.  Defendant said he never had a chance to fully discuss the matter with his defense attorney and wanted more time to decide.  The court replied defense counsel said that they had discussed the decision at length, and that defendant was going to admit the prior conviction.  The court said defendant could have a bench trial but admonished defendant not to "misrepresent the facts as you've done continuously with this Court from the beginning."

Defendant agreed to a bench trial.  However, he interrupted witnesses, declared he was "appalled" by the court's conduct, accused his defense counsel of misconduct, and claimed he was too ill for the hearing to continue.  Defendant went on a lengthy narrative and said a tragedy was about to happen, he loved his country and the Constitution, he admired the men who wrote the Declaration of Independence, and he had to do what was right.  Defendant accused the court of suppressing him for months and his attorney of being sleazy, forcing him to waive his rights, and not discovering the tape recording of Officer Jauregui's interview with A.G.

The court repeatedly asked defendant to stop.  Defendant kept talking.  The court advised defendant that the deputy would restrain or gag him if he continued and asked what he wanted.  Defendant said he wanted another continuance and for the court "not to

35.

finalize the verdict." The court refused and said he could appeal, and believed defendant was just trying to drag out the hearing.

The court added:

"[Y]ou're not helping your record much. You realize that, don't you? Everything you've said is on the record, and an appellate court … is going to review this, and a lot of the things that you're doing are not enamoring or showing the appellate court that you're thinking straight."

After another recess, the hearing resumed and the court found the prior conviction allegations true. Defendant again interrupted and said he had physical and mental problems. The court instructed the deputy to tell the jail that defendant needed an examination and his medication. Defendant said he still had more things to say. The court suggested that he wait for the sentencing hearing. Defendant refused and went into another lengthy statement. He complained about his defense attorney and claimed everyone had conspired against him. The court adjourned.

## N. The Sentencing Hearing

We now reach the sentencing hearing, which is the subject of defendant's appellate argument that the court committed reversible error when it denied his *Faretta* motion.

### 1. *Second Faretta Motion*

As soon as the court convened the sentencing hearing, defendant made a *Faretta* motion to represent himself, and complained about both the public defender's office and Mr. Baly.

The court acknowledged that prior to trial, defendant was found competent to represent himself and his *Faretta* motion was granted. Defendant then asked for the court to reappoint counsel, and the court made sure defendant got Mr. Baly again, as he requested.

The court denied defendant's *Faretta* motion for the sentencing hearing based on his conduct during trial, stating: "[Y]our incompetence has shown throughout this entire

36.

process [and] your obstreperous manner, your inability to understand the legal concepts that Mr. Baly has tried to convince you of."

> "The record is full of references to where you are not going to proceed on this case, you are not going to trial, you are not going to be sentenced, you are not going to cooperate with the Court in any manner.  [¶]  All right.  Now, I believe that this is another opportunity for you to delay the proceedings."

### 2. *Third Marsden Motion*

Once the court denied defendant's final *Faretta* motion, defendant immediately asked to discharge Mr. Baly and for another public defender.  The court said it would conduct a *Marsden* hearing, but it believed the request was part of his "continued efforts to delay the proceedings, your continued efforts to overcome the Court's direction, and it appears that this is once again another opportunity for you to delay the proceedings."

At the final *Marsden* hearing, defendant gave another lengthy narrative about the history of his case, claimed he was prevented from reviewing or accepting a previous plea offer that would have released him on "parole," discussed grievances he had filed with the jail, claimed the charges would have been dismissed if Mr. Baly followed his instructions about the preliminary hearing, and asserted Mr. Baly refused to consider a newly-issued federal court opinion which would reduce his sentence.  Defendant said Mr. Baly failed to discover perjury by prosecution witnesses, refused to introduce the late-discovered tape recording into evidence, and declared he was going to place the court, the prosecutor, and Mr. Baly under citizen's arrest.  Defendant said he never tried to stall, but asked to postpone the sentencing hearing for one week.

The court replied that defendant failed to state a legitimate reason to discharge Mr. Baly, and he was just trying to delay the proceedings again.  Defendant said he had been bullied, his trial was not fair, everyone conspired against him, and the court was going to "crank up the conveyor belt to Wasco" prison.

Mr. Baly said he visited defendant in jail numerous times during the trial. He asked defendant if he had any specific questions for the trial witnesses; he gave defendant a copy of the probation report for sentencing; he looked at the federal court opinion about jail overcrowding; and he advised defendant that the previous plea bargain was no longer relevant.

Defendant told the court that "a real judge would have stopped this farce. I'm afraid it's going to suck you down the pipe too. You people are swirling the drain and you know it."

The court denied defendant's *Marsden* motion:

> "To the extent there are conflicts between statements made during this hearing, I believe Mr. Baly for the following reasons: I have – and the record will reflect all of this – but I have previously reappointed Mr. Baly at [defendant's] request. I have observed Mr. Baly represent [defendant] in a[n] unbelievably tolerant manner. I have seen Mr. Baly tolerate [defendant's] constant interruptions, misrepresentations, and misunderstandings of the law that Mr. Baly has competently tried to explain to him. I have observed Mr. Baly's patience with [defendant], which has been incredible, even in light of the Court's patience with [defendant].

> "I find that Mr. Baly certainly has properly represented and will continue to represent [defendant]. I find that there has not been a breakdown in the relationship between Mr. Baly and [defendant] that would make it impossible for Mr. Baly to continue to effectively represent [defendant]. And, more importantly, I find that any deterioration in that relationship has been caused continually by the willfully recalcitrant and defiant and delaying attitude of [defendant], and there is absolutely no reason why in the future [defendant] cannot be effectively represented by Mr. Baly."

### 3. *Sentencing*

After the court denied the *Marsden* motion, it tried to resume the sentencing hearing, but defendant again asked to make another lengthy statement. Defendant complained his attorney did not follow his directions, he was mistreated in jail, and he had new evidence that A.G. was not a minor and he was really 18 years old. The court

allowed defendant to speak without interruption until defendant said he was "out of gas." Thereafter, the court sentenced defendant to 15 years 8 months.

### O. __Analysis__

Defendant contends his postverdict *Faretta* motion should have been granted because it was knowing, intelligent and unequivocal. However, "[e]quivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation ...." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.) " 'Trial courts are not required to engage in game playing with cunning defendants who would present Hobson's choices.' *Faretta* ... held generally that a defendant may represent himself. It did not establish a game in which a defendant can engage in a series of machinations, with one misstep by the court resulting in reversal of an otherwise fair trial." (*People v. Clark* (1992) 3 Cal.4th 41, 115, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) "[B]y juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions," a court may reasonably conclude the defendant was "playing 'the *Faretta* game' " to delay the proceedings. (*People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.)

Defendant disputes the court's finding that his *Faretta* motion was brought to delay the trial. He notes that his first *Faretta* motion was granted after he was found competent to represent himself. Defendant asserts that he was an "incredibly active participant in the trial and the presentation of the defense," he "closely followed all of the events in his case," he was "well-versed" in the legal principles, and he took an "active part" in questioning witnesses and making objections. Defendant further asserts his postverdict *Faretta* motion was made in "good faith" and not for "purposes of delay or 'to frustrate the orderly administration of justice.' " Defendant declares he was ready to proceed with the sentencing hearing; he had the absolute constitutional right to represent

himself; he was dissatisfied with Mr. Baly's representation; and he never asked for a continuance.

Defendant's characterization of his conduct is refuted by the entirety of the record. As we have extensively set forth above, defendant repeatedly engaged in conduct to delay every aspect of the criminal proceedings, except perhaps for his insistence on an immediate bail hearing. Defendant made several *Marsden, Faretta,* continuance, and substitution motions throughout the proceedings. His comments belie his alleged "good faith" in making these motions, and instead demonstrate his intent to continue and delay the trial. Despite earlier promises to maintain decorum, defendant displayed belligerent and disruptive conduct, launched into lengthy narratives claiming misconduct by the "state," and timed his outbursts to occur on the scheduled start of critical hearings, such as the preliminary hearing and the initial trial dates. While defendant eventually asked for reappointment of counsel, he did so on the scheduled trial date and again delayed the trial. During his trial, he disrupted the proceedings by lodging his own objections when he was being cross-examined by the prosecutor. After the verdict was returned, defendant disrupted the bench trial on his prior convictions demanding that the court not "finalize the verdict."

When the court convened the sentencing hearing, defendant again engaged in delaying tactics by making *Faretta* and *Marsden* motions, and declared he was going to place the court, the prosecutor, and Mr. Baly under "citizen's arrest."

The court acted well within its discretion when it denied defendant's *Faretta* motion at the sentencing hearing. Defendant's conduct showed that his *Faretta* motion was part of his renewed efforts to interfere with the court's process and conclusion of his trial. (See, e.g., *People v. Howze* (2001) 85 Cal.App.4th 1380, 1398.)

> " 'The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.' [Citation.] '[A]n accused has a Sixth Amendment right to conduct his own defense, provided only that he

knowingly and intelligently forgoes his right to counsel *and that he is able and willing to abide by rules of procedure and courtroom protocol.*' [Citation.] This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill." (*People v. Welch, supra,* 20 Cal.4th at p. 734, italics added in original.)

While witnesses and a jury were not going to be affected by a continued sentencing hearing, the court was not obliged to permit defendant to further delay matters and take control of the hearing, as he attempted to do throughout the criminal proceedings in this case:

> "The judges of our courts are entitled to conduct their proceedings in an orderly and just fashion, and are not required to place their dockets and courtrooms at the mercy of obstreperous and unruly defendants with long track records of disruptive behavior. Such defendants, may not thwart the functioning of the criminal justice system in this state by making manipulative motions designed to result in the disruption of serious court proceedings for the perceived benefit of the defendant. Just as defendants have certain rights in court, so do courts have the power to preserve their dignity and their basic ability to function. In this case the court acted properly in denying the motion for self-representation and no abuse of discretion occurred." (*People v. Howze, supra,* 85 Cal.App.4th at pp. 1398–1399.)

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
PEÑA, J.

41.